**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

UNITED STATES OF AMERICA

vs.                                                                   Case No.  3:09-cr-220-J-32JRK

CHRISTOPHER MARK SPENCE
        a/k/a John Edward Jackson
_____/

# REPORT AND RECOMMENDATION[1]

        This cause is before the Court on Defendant's Motion to Suppress Physical Evidence

(Doc. No. 36; "Motion"), filed February 1, 2010.  The Motion is opposed.  See Government's

Response to Defendant's Motion to Suppress (Doc. No. 38; "Response"), filed February 4,

2010.  In the Motion, Defendant seeks to suppress "the marijuana and firearms seized by

members of the Florida Highway Patrol from a gray Chevrolet Avalanche, a storage unit

located at 790 State Road 207, East Palatka, Florida, and Apartment No. 113, 6710 St.

Johns Avenue, Palatka, Florida."[2]  Motion at 1.  The undersigned concludes that Defendant's

arguments in support of his Motion are without merit and recommends that the Motion be

denied.

---

        [1]        Within fourteen (14) days after service of this document, specific, written objections may be
filed in accordance with 28 U.S.C. § 636, Rule 59, Federal Rules of Criminal Procedure, and Rule 6.02(a), Local
Rules, United States District Court, Middle District of Florida.  Failure to file a timely objection waives a party's
right to review.  Fed. R. Crim. P. 59.

        [2]        In Defendant's storage unit, law enforcement found a firearm, personal mail, and approximately
$16,500 in U.S. Currency.  See Motion at 5.  The Motion only seeks to suppress the firearm found during the
search of the storage unit.  See generally id.

## I.  Background

On July 30, 2009, a federal grand jury returned a two-count indictment charging Defendant with knowingly possessing in and affecting commerce a firearm, after having been convicted of crimes punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); and possession with intent to distribute marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(D).[3]  Indictment (Doc. No. 1) at 1-2.  On November 9, 2009, Defendant was arrested and made his initial appearance before the Court.  See Minute Entry (Doc. No. 6).  Defendant was arraigned on November 10, 2009 and entered a plea of not guilty.  See Minute Entry (Doc. No. 13).  Thereafter, on February 1, 2010, the instant Motion was filed.  On February 4, 2010, the Government filed its Response. An evidentiary hearing was held on February 9, 2010.  See Minute Entry (Doc. No. 39); Transcript (Doc. No. 44; "Tr. from 2/9/10").  Because of time constraints, the evidentiary hearing was continued to and concluded on February 16, 2010.  See Minute Entry (Doc. No. 41); Transcript (Doc. No. 45; "Tr. from 2/16/10").

## II.  Testimony / Exhibits

The Government called one witness at the February 9, 2010 hearing, Trooper Joshua Earrey ("Trooper Earrey") of the Florida Highway Patrol ("FHP"), and one witness at the February 16, 2010 hearing, Trooper David Cimino ("Trooper Cimino") also of the FHP.  The Government also offered two exhibits.  Defendant called no witnesses but offered three

---

[3]  The provisions cited in Count Two of the Indictment are actually "Sections 841(a)(1) and 841(b)(1)(C)."  See Indictment at 2.  On November 11, 2009, however, on the Government's motion, an Order was entered correcting this scrivener's error to read "Sections 841(a)(1) and 841(b)(1)(D)."  Order (Doc. No. 18) at 1.

exhibits. The witnesses' testimony and the evidence presented are summarized below, followed by a summary of the troopers' respective narcotic K-9s' qualifications.

### A. Trooper Earrey

Trooper Earrey has been employed by the FHP for nine years. Tr. from 2/9/10 at 7. He is "a part of the [FHP] Contraband Interdiction Program," which "enforce[s] all traffic laws on the highway and all criminal violations, including contraband, illegal drugs, currency, and fugitives." Id. at 7, 38. Trooper Earrey works in Troop G, which is located in Jacksonville, Florida. Id. at 7-8. Trooper Earrey has received several awards for his work with the Contraband Interdiction Program. Id. at 39-41.

On August 7, 2008, Trooper Earrey was patrolling I-95 in St. Johns County. Id. at 8. Two other members of the Contraband Interdiction Team were also "in the area": Trooper Rios and Trooper Cimino. Id. at 8, 30. Trooper Earrey did not know exactly where Trooper Rios and Trooper Cimino were located at the time, but he knew they were on I-95 in the same county. Id. at 52. Along with about three other troopers, they were all working in a "unit. . . as a team." Id. at 9. Typically, each unit includes a K-9 officer, who drives a marked sports utility vehicle, and a felony officer, who also drives a marked patrol car which is equipped with a cage for "transport[ing] any prisoners." Id. at 9, 63. On the day in question, Trooper Earrey and Trooper Cimino were the assigned K-9 officers. Id. at 9.

At about 10:19 a.m., Trooper Earrey was traveling northbound on I-95 when he noticed a Chevrolet Avalanche ("Vehicle") traveling in front of his patrol car, following another

vehicle too closely.[4]  Id. at 10, 29, 67, 79.  The other vehicle was towing a boat.  Id. at 10, 67.  The Vehicle was traveling at the rate of approximately 70 miles per hour, which was the posted speed limit.  Id. at 67-68.  The Vehicle was less than one-half of one car length behind the vehicle towing a boat; both vehicles were in the middle lane.  Id. at 68, 79. Trooper Earrey did not believe the driver of the Vehicle "would have had enough time to react . . . safely" if he needed to do so quickly for any reason.  Id. at 68-69.  Knowing that following too closely is a violation of the Florida Traffic Codes, Trooper Earrey decided to pull over the Vehicle.[5]  Id. at 10, 29.  Trooper Earrey activated his overhead lights to conduct a traffic stop.  Id. at 10.  The Vehicle stopped without incident.  Id.

Trooper Earrey exited his patrol car, leaving his K-9, Boss, inside.  Id. at 10-11.  He approached the Vehicle on the passenger's side.  Id.  As he approached, he smelled "an overwhelming odor of air freshener coming from inside the [V]ehicle."  Id.  The smell of air freshener aroused Trooper Earrey's suspicion.  Id. at 72.  An individual later identified as Christopher Spence ("Defendant") was in the driver's seat, and a "young child" was in the front passenger's seat.  Id. at 11.

Trooper Earrey told Defendant he had been pulled over for following too closely, and Defendant agreed he had been following too closely.  Id. at 11-12.  Defendant explained that

---

        [4]        Trooper Earrey explained that 10:19 a.m. is "the time when [he] turned [his] emergency equipment on to make the traffic stop."  Tr. from 2/9/10 at 55.  Eventually, as discussed infra, Defendant was issued a written warning which contains the same time.  See Deft.'s Exh. No. 2.  According to Trooper Earrey, ordinarily during a traffic stop, he runs a vehicle's license plate number as the vehicle is near a complete stop or just after it stops, and he takes down the time that he runs the number.  See Tr. from 2/9/10 at 55.

        [5]        Troopers working shifts other than the midnight shift are not required to notify anyone at FHP headquarters that they are making traffic stops.  Tr. from 2/9/10 at 29.  Because Trooper Earrey was not working the midnight shift on the date in question, he did not notify anyone at FHP headquarters that he was stopping the Vehicle.  Id.

he was traveling from Putnam County to take his daughter to a shopping mall. Id. at 42. Trooper Earrey asked for Defendant's driver's license and registration. Id. at 12. After Defendant provided that information, Trooper Earrey asked Defendant to step back to his patrol car so Trooper Earrey could run some checks on his computer. Id. at 12, 42. Defendant complied and exited the Vehicle; the child stayed in the Vehicle. Id.

Defendant's driver's license was in the name of "Christopher Spence" and indicated his date of birth was November 22, 1964. Id. at 12-13. The registration showed the Vehicle was registered to "Christopher Spence" and a female; however, the registration indicated Defendant's date of birth as December 25, 1955. Id. at 12-13, 36; see also Deft.'s Exh. No. 3 (registration).[6] Trooper Earrey ran Defendant's driver's license number through a computer database to determine whether it was valid, and he called the number in via the North Florida High Intensity Drug Trafficking Area ("HIDTA") radio system to determine Defendant's "criminal history, warrants and things like that." Tr. from 2/9/10 at 13-14. Defendant's driver's license was valid. Id. at 14, 33. The HIDTA radio check revealed that Defendant "had several aliases and he had past arrests for drug violations"; he also had been arrested for driver's license fraud. Id. at 14-15, 17, 33, 71. The radio check further revealed that Defendant's "actual name was John Edward Jackson." Id. at 15, 33. Trooper Earrey does not recall if he was notified whether Defendant is a convicted felon. Id. at 71.

The information revealed through the HIDTA check "raised [Trooper Earrey's] suspicion[.]" Id. at 15. Trooper Earrey asked Defendant about the name John Edward

---

[6] The registration entered as Defendant's Exhibit Number 3 does not have a date of birth printed on it. The undersigned surmises that when Trooper Earrey testified about the December 25, 1955 date of birth, he was referring to a check he ran on his computer using the registration information.

Jackson.  Id.  Defendant became agitated and stated, "'Officer, don't do this to me[.]'"  Id. at 15, 73 (quoting Defendant).  Defendant also volunteered that he is a citizen of the United States but is from Jamaica.  Id. at 16.  According to Trooper Earrey, "[h]e was just offering information which was kind of odd. . . I don't know what he was trying to prove."  Id.  During the encounter, Defendant "appeared to be kind of nervous about all the alias names, kind of agitated about it[.]"  Id. at 17.

At some point, Trooper Cimino arrived and parked his patrol vehicle to the right of Trooper Earrey's patrol vehicle on the shoulder of the interstate.  Id. at 15, 33, 65.  Trooper Cimino also had his K-9, Goblin, with him.  Id. at 33, 65.  Trooper Earrey recalls that Goblin stayed inside Trooper Cimino's patrol vehicle for the duration of the traffic stop.  Id. at 65.  Trooper Cimino ran the information on Defendant's registration through the DAVID (Driver and Vehicle Information Database) system.  Id. at 16, 70.  A picture of Christopher Spence appeared: the individual in the picture was a white male, id. at 16, although Defendant is a black male.

Trooper Earrey wrote Defendant a warning for following too closely which was time-stamped 10:19 a.m.[7]  Id. at 17, 34, 55; see also Deft.'s Exh. No. 2 (warning given to Defendant).  Trooper Earrey filled out the warning on his computer, printed it, and handed it to Trooper Cimino, who delivered it to Defendant.  Tr. from 2/9/10 at 18, 34, 44.  Trooper Cimino explained the printed warning to Defendant.  Id. at 18.  After that, Trooper Earrey again "made contact with [Defendant] and engaged him in conversation."  Id.  K-9 Boss was

---

[7]     A "warning" differs from a citation in that the individual receiving a warning does not have to pay a fine, and does not get any points on his/her license, even though the individual committed the traffic violation.  Tr. from 2/9/10 at 17.  The officer has discretion to write a citation or a warning.  Id. at 17, 60.

still in Trooper Earrey's patrol car during this time.  Id.  Trooper Earrey asked Defendant if there was any marijuana in the Vehicle.  Id. at 18-19.  Defendant responded, "'No.  I hate having officers in my child's face every time.  Don't do this to me.'"[8]  Id. at 19, 62 (quoting Defendant).  Trooper Earrey thought that reaction could be an indicator that Defendant was trying to hide something.  Id. at 72.  According to Trooper Earrey, Defendant's driver's license and vehicle registration were returned, the printed warning was handed to him prior to the questioning, and Defendant "was free to leave[.]"  Id. at 43, 75, 80.  Defendant, however, was not told he was free to leave.  Id. at 43.  Trooper Earrey's overhead lights remained on during the questioning.  Id. at 64.

Trooper Earrey asked Defendant for consent to search the Vehicle.  Id. at 19. Defendant refused to consent to the Vehicle being searched.  Id.  Trooper Earrey had already decided, prior to asking for Defendant's consent to search the Vehicle, to deploy K-9 Boss on the Vehicle, although Boss was not deployed until after Defendant refused to consent.  Id. at 19, 43, 62.  Trooper Earrey testified that regardless of whether Defendant consented to the Vehicle being searched, because of the circumstances, he was going to deploy the K-9.  Id. at 63.

The child was asked to step outside of the Vehicle.  Id. at 26.  Trooper Earrey does not know how much time passed between the Vehicle being pulled over and Boss being deployed.  Id. at 46-47.  Trooper Earrey leashed Boss, took him out of his patrol vehicle, walked him to the front passenger's side headlight of the Vehicle, sat him down, gave him the command to "seek," and took him around the Vehicle in a counter-clockwise direction.

---

[8]        Defendant stated, "Don't do this to me" twice during the traffic stop.  Tr. from 2/9/10 at 72.

Id. at 26, 66.  When Boss approached the driver's side door, he "put his front feet up on . . . the driver's door seam and started scratching[.]" Id. at 26.  The scratching is a signal to Trooper Earrey that there is a presence of narcotic odor inside the Vehicle.  Id.

Trooper Earrey searched the Vehicle.  Id.  On the right floorboard, there was a tote bag which contained approximately "three packages of marijuana . . . inside of heat-sealed bags[.]" Id.  The tote bag also contained dryer sheets.  Id.

Defendant was placed under arrest for possession of marijuana.  Id. at 27, 47. Although Trooper Earrey does not know exactly when Defendant was arrested, he called in the arrest at 11:02 a.m.  Id. at 53-55; see also Deft.'s Exh. No. 1 (call history for traffic stop and arrest).  Defendant was permitted to use the telephone to call someone to pick up the child.  Tr. from 2/9/10 at 27.  Trooper Rios arrived to transport Defendant because Trooper Earrey and Trooper Cimino both had K-9 patrol vehicles and were unable to transport him. Id.

Troopers from FHP eventually went to and searched a storage unit in Hastings, Florida after obtaining a search warrant for the unit.  Id.  Trooper Earrey did not immediately go to the storage unit, but he did after the traffic "scene was cleared."  Id. at 28, 48.  Before the search warrant was obtained, Trooper Earrey's K-9, Boss, and Trooper Cimino's K-9, Goblin, alerted to the presence of drugs inside unit 255.  Id. at 50, 65.  Trooper Earrey did not obtain the search warrant, but he was present for the search after it was obtained.  Id. at 28.  Officers did not find any drugs but did find a rifle and some currency.  Id. at 50.

Trooper Earrey also went to an apartment with other troopers, and after obtaining consent to search,[9] they searched the apartment. Id. at 28, 48-49.

## B. Trooper Cimino

Trooper Cimino is employed by FHP. Tr. from 2/16/10 at 5. He has been a trooper with FHP for about eight years. Id. Like Trooper Earrey, he is assigned to the Contraband Interdiction Program as a K-9 handler, and he is a part of the HIDTA Task Force. Id. at 5, 18, 32.

On August 7, 2008, Trooper Cimino was on duty driving a marked FHP Chevrolet Tahoe when he received a call from Trooper Earrey over their Nextel direct-connect walkie-talkie style cellular phones. Id. at 5-6, 17-18. Trooper Cimino thinks he had seen Trooper Earrey "a few minutes" prior to receiving the call, when Trooper Cimino had an unrelated vehicle pulled over and Trooper Earrey passed him on I-95. Id. at 18. Trooper Earrey advised Trooper Cimino that he had stopped an individual and requested that Trooper Cimino provide backup assistance. Id. at 5-6. According to Trooper Cimino, if Trooper Earrey needs backup assistance, "he either ha[s] somebody that [is] overly nervous or smell[s] something that [i]s obvious to him or something like that." Id. at 32. Trooper Earrey's traffic stop had occurred on "I-95 northbound somewhere in St. Johns County." Id. at 6.

When Trooper Cimino arrived, he saw Defendant standing beside Trooper Earrey's patrol vehicle on the passenger's side. Id. at 6-7. Trooper Earrey was sitting in the driver's

---

[9]     Trooper Earrey does not recall if he or another trooper obtained consent to search the apartment. Tr. from 2/9/10 at 49.

seat of the patrol vehicle.  Id.  Trooper Earrey's passenger window was open and the two were engaged in conversation.  Id. at 7.  Trooper Cimino exited his patrol vehicle and approached Trooper Earrey and Defendant. Id. at 7-8.  Trooper Cimino's K-9, Goblin, stayed in his patrol vehicle.  Id. at 8.

At some point, Trooper Cimino ran a computer check on the DAVID computer program using the information on the Vehicle's registration.  Id. at 8, 23, 24.  The results indicated the owner of the Vehicle was Christopher Spence, a white male.  Id. at 8, 23. Trooper Cimino found the results to be odd, since the individual Trooper Earrey had stopped was a black male.  Id. at 8.

Eventually, Trooper Earrey wrote Defendant a warning.  Id.  Trooper Cimino took the printed warning to Defendant and explained it to him.[10]  Id. at 8-9, 25, 28.  While Trooper Cimino explained the printed warning, Trooper Earrey was preparing to deploy K-9 Boss. Id. at 9.  Trooper Cimino gave Defendant's driver's license and registration back to him after the warning was explained.  Id.  Trooper Cimino did not tell Defendant he was free to leave. Id. at 26.

Trooper Cimino estimated that no more than "[f]ive to ten" minutes passed between the time Trooper Earrey called for assistance and the time Boss was deployed on the Vehicle.  Id. at 26-27.  Trooper Cimino recalls Trooper Earrey asking for consent to search the Vehicle, and Defendant declining to consent.  Id. at 29.  Once Boss was deployed, Trooper Cimino was not in a position to see Boss alert to the presence of narcotics, but he

---

[10]     It is routine in the Contraband Interdiction Team for a backup officer to explain a warning or citation to an individual "while the primary officer conducts his business, whatever it may be at the time."  Tr. from 2/16/10 at 9.

did hear Trooper Earrey praising Boss for alerting. Id. at 10. Trooper Cimino stood with Defendant and the child about fifteen feet from the Vehicle while Trooper Earrey searched it. Id. Defendant was eventually placed under arrest. Id. Because Defendant had a child with him, the officers allowed him to use his cellular telephone to call someone to pick up the child. Id. at 11. Trooper Cimino could partially hear Defendant's cellular telephone conversation. Id. Defendant "[told] someone to go to his storage unit in Hastings. And [Trooper Cimino] heard him say something about getting 16 out of his safe." Id. at 11-12. Trooper Cimino "also heard him say something about a couch, but [he] [did not] know what that was about." Id. at 12. Trooper Cimino heard the last two digits of the storage unit number: 55. Id. He did not hear the first digit. Id.

Knowing that there is only one storage unit business in Hastings, Florida, Trooper Cimino proceeded to the storage unit business after the stop was completed.[11] Id. Trooper Cimino spoke with the manager and asked whether Christopher Spence was renting unit number 555. Id. The manager replied that Mr. Spence was not renting unit number 555; rather, he was renting unit number 255. Id. at 12-13. The manager "thought something was going on with that unit because Mr. Spence had made several trips to the unit." Id. at 13.

Eventually, Trooper Earrey joined Trooper Cimino and the other law enforcement officers at the storage unit business. Id. Defendant was taken there as well. Id. Trooper Cimino thinks Defendant was transported by Trooper Rios. Id. at 34. Trooper Cimino deployed K-9 Goblin on approximately five different units. Id. at 15, 34. Goblin alerted to

---

[11]     Trooper Cimino could not remember the name of the storage unit business. Tr. from 2/16/10 at 12.

unit number 255 by scratching.  Id. at 15.  Goblin did not alert to any other units.  Id. at 35.  Trooper Earrey also deployed K-9 Boss on the same five units.  Id. at 15.  Boss alerted to unit number 255 but did not alert to any other units.  Id. at 36.

A search warrant was later applied for, issued, and executed on unit number 255.  Id. at 15, 35.  Trooper Cimino was not involved in the search, but he watched as other officers conducted the search.  Id. at 15-16. Officers found, inter alia, approximately $16,000 in U.S. currency inside a safe or lockbox in the storage unit.  Id. at 30.  Eventually, Agent Travis Smith ("Agent Smith") of the Florida Department of Law Enforcement ("FDLE") "had some kind of conversation with [Defendant], and [Trooper Cimino] believe[s] [Defendant] told [Agent Smith] that he had something in [an] apartment."  Id. at 16.  Trooper Cimino eventually went to the apartment after the search of the apartment was underway.  Id. at 37.  Trooper Cimino had no other involvement in the case.  Id. at 16.

## C. K-9 Qualifications

### 1. Boss

Trooper Earrey worked with Boss from early 2006 to January 2010.  Tr. from 2/9/10 at 20-21.  Prior to working with Trooper Earrey, Boss did not work with any other handlers.  Id. at 21.  In 2007, the pair completed 320 hours of drug detection training in Tallahassee, Florida.  Id. at 21-22; see also Gov't.s Composite Exh. No. 1.  All FHP K-9s attend the training in Tallahassee before becoming certified.  Tr. from 2/9/10 at 21-22.  Their instructor was Trooper Michael Van Leer.  Id. at 21.  At the end of the training, they took an examination which consisted of a series of exercises.  Id.  They passed the examination and

were certified as a team.  Id. at 21-22.  The pair also initially trained at the International Forensic Research Institute of Florida International University.  Id. at 24.

When together, the pair had to meet yearly training requirements, which included "280 drug finds a year, or drug hides a year[.]"  Id. at 22.  The training included hides in vehicles. Id.  Boss "is proficient" in his training.  Id.  At the end of each year, the pair had to be recertified.  Id.  Since 2007, Boss has never failed any of his recertifications.  Id. at 23.  The pair was never sent to remedial training.  Id.  Prior to the stop at issue, Boss's last recertification had occurred on August 4, 2007.  Id. at 25.  Of 945 hides prior to the last recertification, Boss found all of them.  Id.  In Trooper Earrey's training and experience, Boss was reliable in both training and field work.  Id.  Boss alerts by scratching with his front paws. Id.

### 2.  Goblin

Goblin and Trooper Cimino have worked together for approximately three years.  Tr. from 2/16/10 at 14.  Goblin's career with FHP has spanned "[b]etween 11 and 12 years."  Id. Goblin's experience prior to working with Trooper Cimino was extensive.  Id.  Trooper Cimino and Goblin are certified together as a team.  Id.  Goblin is trained to detect drugs and other things.  Id. at 19.  Initially, Goblin performed "between 320 and 360 hours" of narcotic training.  Id.

Trooper Cimino and Goblin are required to keep up with yearly recertification requirements.  Id. at 14.  The pair has maintained their yearly recertifications.  Id. Occasionally, Goblin has had to go to remedial training for "bump[ing] a piece of luggage" during training and alerting to the luggage.  Id. at 15.  Goblin has "never [falsely] alerted to

anything" other than luggage during his training. Id. In addition, Trooper Cimino testified that Goblin "has never had a false alert where [he] found absolutely nothing," meaning when Goblin alerts and narcotics are not found, Trooper Cimino can "either still smell the smell of burnt cannabis, [he] find[s] a seed, [he] find[s] a piece of cannabis, or . . . some kind of other paraphernalia relating back to cannabis or another drug." Id. at 21.

### III.  Summary of Argument

Defendant seeks to suppress "the marijuana and firearms seized by members of the [FHP] from [the Vehicle], a storage unit located at 790 State Road 207, East Palatka, Florida, and Apartment No. 113, 6710 St. Johns Avenue, Palatka, Florida." Motion at 1.  Defendant argues his roadside detention "was illegal as its duration was longer than necessary to process the traffic violation." Id. at 2.  With respect to the roadside detention, Defendant contends Trooper Earrey should not have deployed his dog after Defendant refused to consent to the Vehicle being searched. Id. at 7.  Additionally, Defendant contends Trooper Earrey did not have "probable cause to search the [Vehicle] without a warrant." Id. at 2.  In arguing that probable cause did not exist, Defendant attacks the reliability of the dog sniff. Id. at 7, 8.  Finally, according to Defendant, "[t]he subsequent search of the storage unit and apartment resulted in the discovery of additional evidence, i.e. firearms and marijuana, which is fruit of the poisonous tree and should be excluded as evidence. . . ."[12] Id. at 2.

---

[12] At the hearing held on February 16, 2010, Defendant confirmed he is "not asserting a problem with the search warrant and its issuance." Tr. from 2/16/10 at 53.  Instead, Defendant's "focus is on the stop, the detention and the behavior . . . which led to the search of the [Vehicle]." Id.  Therefore, the undersigned does not address the Government's contention that the search warrant for the storage unit was properly issued. See Response at 10.

The Government responds that the traffic stop was permissible. Response at 4. Further, the Government contends that Defendant was not detained beyond the time necessary to conduct the traffic stop, and that even if Defendant was detained for longer than necessary to conduct the stop, reasonable suspicion existed to justify the brief detention. Id. at 4-8. In addition, the Government argues that Trooper Earrey was justified in deploying K-9 Boss, and that the dog was sufficiently reliable. Id. at 8-9.

## IV. Analysis

### A. Initial Traffic Stop

Defendant does not directly attack the reason for the initial traffic stop, but he does argue "[t]he Court should examine the circumstances surrounding the initial stop of the Defendant's vehicle to determine if probable cause existed to justify . . . [a] limited 'seizure[.]'" Motion at 6. "Traffic stops qualify as seizures under the Fourth Amendment." United States v. Ramirez, 476 F.3d 1231, 1236 (11th Cir. 2007) (citation omitted). "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." Whren v. United States, 517 U.S. 806, 810 (1996). In addition, an investigatory stop of a vehicle is permissible under the Fourth Amendment if an officer has reasonable suspicion that criminal activity is afoot. See Terry v. Ohio, 392 U.S. 1 (1968); see also United States v. Nunez, 455 F.3d 1223 (11th Cir. 2006) (holding that an investigatory stop of a vehicle was lawful because officers had reasonable suspicion that the occupants of the vehicle were involved in criminal activity). Thus, "a traffic stop is a constitutional detention if it is justified by reasonable suspicion under Terry or probable cause to believe that a traffic violation has occurred under Whren . . . ."

<u>United States v. Chanthasouxat</u>, 342 F.3d 1271, 1275 (11th Cir. 2003). In Florida, it is a noncriminal traffic infraction to follow another vehicle "more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon, and the condition of, the highway." <u>See</u> Fla. Stat. §316.0895. Therefore, probable cause to believe a violation of this Section is occurring constitutionally justifies a traffic stop.

Here, the initial stop of the Vehicle was lawful. Trooper Earrey testified that he observed the Vehicle traveling in front of his patrol car in the middle lane of I-95. The Vehicle was traveling about 70 miles per hour, the posted speed limit. The Vehicle was following another vehicle, which was towing a boat, less than one-half of one car length behind the vehicle towing the boat. Trooper Earrey testified he did not believe the driver of the Vehicle would have had enough time to react safely if he needed to do so quickly for any reason. Under the circumstances, Trooper Earrey had probable cause to believe that a traffic violation was occurring and lawfully stopped the Vehicle. <u>See</u> <u>United States v. Purcell</u>, 236 F.3d 1274, 1276 n.5 (11th Cir. 2001) (finding "no error" in the district court's determination that a deputy legally stopped a vehicle for a violation of Section 316.0895 when it was "about three car lengths behind the vehicle ahead of it"); <u>United States v. Artiles-Martin</u>, No. 5:08-cr-14-Oc-10GRJ, 2008 WL 2600787, at *7 (M.D. Fla. June 30, 2008) (unpublished) (finding probable cause to stop a vehicle that an officer observed "following only two car lengths behind a vehicle traveling on an interstate at the posted speed limit of 70 miles per hour").

**B. Duration and Scope of Stop**

Defendant next argues that the duration of the traffic stop was impermissibly extended. Motion at 2. In attacking the duration of the stop, Defendant contends that Trooper Earrey did not have a reasonable, articulable suspicion of criminal activity which would justify detaining Defendant for longer than necessary to write the warning. Id. at 6-7; Tr. from 2/16/10 at 46.

"[A]n officer's investigation of a traffic stop must be 'reasonably related in scope to the circumstances which justified the interference in the first place.'" United States v. Boyce, 351 F.3d 1102, 1106 (11th Cir. 2003) (quoting Terry, 392 U.S. at 20); see also Ramirez, 476 F.3d at 1236. The law enforcement officer making the stop may "'investigate the driver's license and the vehicle registration,'" which may be done by "'requesting a computer check.'" Boyce, 351 F.3d at 1106 (quoting Purcell, 236 F.3d at 1278). In addition, a law enforcement officer may prolong a traffic stop "while waiting for the results of a criminal history check that is part of the officer's routine traffic investigation." Boyce, 351 F.3d at 1106-07 (citing Purcell, 236 F.3d at 1278). "Reasonableness is measured by examining the totality of the circumstances." Purcell, 236 F.3d at 1279 (citations omitted). "Rigid time limitations and bright-line rules are generally inappropriate." Id. (citations omitted). "The stop 'may not last any longer than necessary to process the traffic violation unless there is an articulable suspicion of other illegal activity.'" Boyce, 351 F.3d at 1106 (quoting Purcell, 236 F.3d at 1278). If there is a reasonable, articulable suspicion of criminal activity, however, a law enforcement officer may briefly detain an individual for investigatory purposes. Terry, 392 U.S. at 30; see also United States v. Powell, 222 F.3d 913, 917 (11th Cir. 2000) (stating that

"[u]nder <u>Terry</u>, law enforcement officers may detain a person briefly for an investigative stop if they have a reasonable, articulable suspicion based on objective facts that the person has engaged in, or is about to engage in, criminal activity").

"'[R]easonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence[.]" <u>Illinois v. Wardlow</u>, 528 U.S. 119, 123 (2000) (citing <u>United States v. Sokolow</u>, 490 U.S. 1, 7 (1989)); <u>see also</u> <u>United States v. Arvizu</u>, 534 U.S. 266, 274 (2002). "Reasonable suspicion is determined from the totality of circumstances and collective knowledge of the officers," which is necessarily "based on commonsense judgments and inferences about human behavior." <u>United States v. Nunez</u>, 455 F.3d 1223, 1226 (11th Cir. 2006) (internal citation and quotation omitted). When assessing the factors identified by an officer, a court must view them in totality and cannot engage in a "'divide-and-conquer analysis[.]'" <u>United States v. Bautista-Silva</u>, 567 F.3d 1266, 1273-74 (11th Cir. 2009) (quoting <u>Arvizu</u>, 534 U.S. at 273-78). Accordingly, "reasonable suspicion may exist even if each fact 'alone is susceptible of innocent explanation.'" <u>Bautista-Silva</u>, 567 F.3d at 1273-74 (quoting <u>Arvizu</u>, 534 U.S. at 273-78). To meet the requisite objective reasonable suspicion, "[t]he officer must be able to articulate more than an 'inchoate and unparticularized suspicion or hunch' of criminal activity." <u>Wardlow</u>, 528 U.S. at 123-24 (quoting <u>Terry</u>, 392 U.S. at 27).

Assuming that Defendant was detained after the Vehicle registration and Defendant's driver's license were returned and a warning was issued to him, given the totality of the circumstances here, the length and scope of both the traffic stop and the subsequent detention were justified. Trooper Earrey took a reasonable amount of time to investigate the

traffic stop, and he simply ran routine computer checks during that time. Before the traffic stop ended, that is, before Defendant's documents were returned and a warning was given to him, the troopers had developed reasonable, articulable suspicion of criminal activity which justified a brief detention for investigatory purposes.

Trooper Earrey testified that he saw the Vehicle following too closely and pulled it over at about 10:19 a.m. on August 7, 2008. Upon approaching the Vehicle, Trooper Earrey noticed an overwhelming scent of air freshener which caused him to have some suspicion. See United States v. Gonzales, 342 F. App'x 446, 449 (11th Cir. Aug. 5, 2009) (unpublished) (finding "the district court did not clearly err" when it found that the "'overwhelming' odor" of air freshener, among other factors, amounted to reasonable suspicion). Trooper Earrey then told Defendant why he had pulled him over, and Defendant agreed that he had been following the vehicle in front of him too closely. After obtaining Defendant's license and registration, Trooper Earrey returned to his patrol car to run some checks on his computer. See Boyce, 351 F.3d at 1106 (indicating it is permissible to investigate a driver's license and vehicle registration via computer checks).

When Trooper Earrey was reviewing Defendant's license and registration and running the computer checks, several matters raised his level of suspicion: (1) the date of birth on the driver's license was different from the date of birth revealed by the computer check using the registration information; (2) the computer checks revealed Defendant had used several aliases in the past; (3) the computer checks revealed Defendant had been arrested in the past for drug violations and for driver's license fraud; and (4) the computer checks revealed Defendant's actual name is John Edward Jackson, although his driver's license is in the

name of Christopher Spence. Upon asking Defendant about the name John Edward Jackson, Defendant became nervous and agitated and stated, "Officer, don't do this to me." See United States v. Gordon, 231 F.3d 750, 756 (11th Cir. 2000) (stating, "Our cases have also recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion"). Defendant began volunteering information about his citizenship status, which Trooper Earrey found odd.

Trooper Cimino estimated that he was called to the scene as a backup officer "a few minutes" after he had last seen Trooper Earrey on I-95. When Trooper Cimino arrived, he conducted a computer check through the DAVID system. Trooper Cimino learned through DAVID that Christopher Spence is a white male. Trooper Cimino could observe that Defendant is a black male. The discrepancy between the description on the DAVID system and Defendant's physical appearance was another factor that raised the officers' suspicion.

Defendant was issued a warning time-stamped 10:19 a.m.[13] Up to this point, the investigation involving computer checks was reasonably related in scope to the traffic infraction, and the length of the stop was not prolonged beyond the time necessary to issue the warning. By the time the warning was issued, however, the factors identified above had coalesced into reasonable suspicion of criminal activity, which justified additional investigation.

After Defendant's documents were returned to him and a warning was provided to him, Trooper Earrey engaged him in conversation. Defendant was asked if there was any

---

[13] As discussed supra at n.4, 10:19 a.m. is the time Trooper Earrey believes he actually stopped the Vehicle for the traffic infraction.

marijuana in the Vehicle, to which he replied, "No. I hate having officers in my child's face every time. Don't do this to me." This reaction made Trooper Earrey think Defendant was trying to hide something. Defendant was asked to consent to the Vehicle being searched and he refused to consent. Shortly after Defendant refused to consent to his Vehicle being searched, Boss was deployed. After Boss alerted, the Vehicle was searched and narcotics were found. Defendant was placed under arrest. The arrest was called in to FHP headquarters at 11:02 a.m.; therefore, no more than forty-five minutes passed between the time Trooper Earrey stopped the Vehicle and the time Defendant was ultimately arrested. In addition, Trooper Cimino arrived while the traffic stop was ongoing, and Defendant had not yet been issued a warning. Trooper Cimino estimated that no more than five to ten minutes passed between the time Trooper Earrey called him for assistance and the time Boss was deployed. Given the totality of the factors, the length and scope of the traffic stop for following too closely were permissible. Before the traffic stop ended, the troopers had reasonable, articulable suspicion that criminal activity was afoot and were justified in their investigation of such suspicion. See United States v. Davis, 343 F. App'x 589 (11th Cir. 2009) (unpublished) (holding that after a traffic citation was issued, a detention for "no more than five to ten minutes" while waiting for a drug dog to arrive was "not unreasonable" because officers had "reasonable suspicion that [the defendant] was involved in criminal activity"). Accordingly, the length of the entire roadside detention was reasonable under the circumstances.

Defendant argues that the "continued questioning was not necessary to process the traffic violation, and was therefore illegal, as was the decision to deploy the drug dog after

Mr. Spence refused to consent to the search of [the] [V]ehicle." Motion at 7 (citing <u>Boyce</u>, 351 F.3d at 1102). In <u>Boyce</u>, the Eleventh Circuit found that officers had not developed reasonable, articulable suspicion to justify prolonging a traffic stop for further investigation, and reversed the district court's denial of the defendant's suppression motion. <u>Boyce</u>, 351 F.3d at 1104. The district court had found that several factors amounted to reasonable, articulable suspicion of criminal activity, but the Eleventh Circuit disagreed, noting that "the record . . . does not substantiate the district court's findings that all of the[] factors existed[.]" <u>Id.</u> at 1108. The Eleventh Circuit also found "troubling" that one of the officers believed he had suspicion to justify a detention but "was still willing to let [the defendant] go with nothing but a warning." <u>Id.</u> at 1110. The Court found that because the officer had not actually developed reasonable, articulable suspicion of criminal activity, the detention of the defendant while waiting for a drug dog to arrive was not reasonable under the Fourth Amendment. <u>Id.</u>

Here, there is a seemingly inexplicable inconsistency between Trooper Earrey's testimony that his suspicion was raised at several points during the stop and never dispelled, and both troopers' testimony that Defendant was "free to leave" after receiving the warning. Like the Court in <u>Boyce</u>, the undersigned finds it troubling that Trooper Earrey on the one hand thought he had reasonable suspicion that criminal activity was afoot, but on the other hand was apparently willing to let Defendant go on his way and testified that Defendant was in fact free to leave. However, the subjective intent of the officers with respect to Defendant's detention status is of no moment here. The determination of whether an individual is detained is an objective standard in which a court decides whether a reasonable

person would feel free to leave. See Florida v. Bostick, 501 U.S. 429, 434 (1991) (stating "mere police questioning does not constitute a seizure" and "[s]o long as a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual and no reasonable suspicion is required") (internal quotation omitted); United States v. Perez, 443 F.3d 772, 777-78 (11th Cir. 2006). Whether a reasonable person in Defendant's position would believe he was free to leave need not be decided here. Even assuming Defendant was detained and was not free to leave, the continued detention was permissible because, unlike the situation in Boyce, reasonable suspicion of criminal activity existed before the traffic stop ended. See supra at pp. 18-21.

Also in Boyce, the Eleventh Circuit determined that "the decision to detain [the defendant] and to call the drug dog unit was based on [the defendant's] refusal to consent to a search of his vehicle." Boyce, 351 F.3d at 1110. Because the Boyce Court earlier in its opinion found that the officer had not developed reasonable, articulable suspicion that criminal activity was afoot, the Court disapproved of detaining the defendant while waiting for a drug dog to arrive. Id. Here, there was reasonable, articulable suspicion to justify detaining Defendant before he refused to consent and the drug dog was deployed.[14] Cf. Davis, 343 F. App'x at 591. Additionally, the drug dog was present for the duration of the stop, so Defendant was not detained an unreasonable amount of time while waiting for a dog to arrive.

_____

[14]     Of course, Defendant's refusal to consent cannot be a factor contributing to the reasonable suspicion of criminal activity. See Boyce, 351 F.3d at 1110 (disapproving of a continued detention because a defendant refused to consent to his vehicle being searched).

Defendant further relies on Marshall v. Florida, 864 So.2d 1139 (Fla. 1st DCA 2003). In Marshall, a defendant was pulled over for crossing a solid line and driving on the shoulder of a road. Id. at 1140. The defendant was asked to step out of his vehicle and was asked some questions. Id. "Having received satisfactory answers to his inquiries, the deputy issued the [defendant] a warning citation for failure to maintain a single lane." Id. Even though "the deputy considered the traffic stop and his investigation to be complete," another deputy arrived at the scene as the citation was being handed to the defendant and the other deputy "initiated further questioning[.]" Id. The two deputies thought there were some inconsistencies in the defendant's answers, so they decided to deploy a drug dog that one of the deputies had in his patrol vehicle. Id. The dog alerted to the vehicle, a search was conducted, and the deputies found cocaine inside. Id. The Marshall court held that a roadside search resulting from a dog alert "was the product of an illegal detention[.]" Id. at 1141. Having found in the instant case that Defendant was lawfully detained based on reasonable, articulable suspicion of criminal activity, Marshall is inapposite.

**C. Probable Cause[15]**

Finally, Defendant argues the search of the Vehicle was not supported by probable cause. Motion at 8. In doing so, Defendant attacks the reliability of K-9 Boss. Id.

Generally, the Fourth Amendment requires law enforcement officers to obtain a warrant before conducting a search. Maryland v. Dyson, 527 U.S. 465, 466 (1999). However, there is an exception to the warrant requirement for automobiles because their

---

[15]    The Government does not contest Defendant's standing to challenge the search of the Vehicle. Tr. from 2/9/10 at 5.

mobility makes obtaining a search warrant impracticable.  See United States v. Ross, 456 U.S. 798, 806-07 (1982); see also Dyson, 527 U.S. at 466-67; Carroll v. United States, 267 U.S. 132, 153-54 (1925).  "Under the automobile exception, agents may conduct a warrantless search of a vehicle if (1) the vehicle is readily mobile (i.e., operational); and (2) agents have probable cause to believe the vehicle contains contraband or evidence of a crime."  United States v. Tamari, 454 F.3d 1259, 1261 (11th Cir. 2006); see also United States v. Lindsey, 482 F.3d 1285 (11th Cir. 2007).  When the automobile exception applies, police officers may conduct a search of the vehicle that is as thorough as could be authorized in a warrant particularly describing the place to be searched.  Ross, 456 U.S. at 800, 823-24 (internal quotation and citation omitted).

Here, the Vehicle driven by Defendant was mobile and operational.  Therefore, the first requirement of the automobile exception is satisfied.  As to the second requirement of the automobile exception, Defendant argues in the Motion that the positive alert of the K-9 did not establish probable cause because the K-9 was not reliable.  See Motion at 8; Tr. from 2/16/10 at 44.  With respect to dog sniffs and alerts, courts have recognized that an alert by a well-trained canine for the presence of narcotics can create probable cause and have evidentiary value.  See, e.g., United States v. Place, 463 U.S. 696, 707 (1983) (discussing the intrusiveness of a dog sniff in the context of Fourth Amendment protections); United States v. Banks, 3 F.3d 399, 402 (11th Cir. 1993) (citing prior Eleventh Circuit precedent and stating, "Our circuit has recognized that probable cause arises when a drug-trained canine alerts to drugs") (internal citations omitted); United States v. Toepfer, Nos. 04-60090, 06-12718, 2008 WL 2673878, at *2 (11th Cir. July 9, 2008) (per curiam) (unpublished)

("probable cause is established when drug-trained canine alerts to drugs") (citing Banks, 3 F.3d at 402). In the context of determining a motion to suppress narcotics found in a vehicle, this Court recently recognized that the Eleventh Circuit has found "training alone" can be sufficient to prove a narcotics detection K-9's reliability. United States v. Anderson, No. 3:08-cr-256-J-32HTS, 2008 WL 5235111, at *2 (M.D. Fla. Dec. 15, 2008) (unpublished) (citing Banks, 3 F.3d at 402) (other internal citations omitted).

The Government established Boss's training through the testimony of Trooper Earrey and by admitting into evidence the pair's training certificates. Boss initially completed 320 hours of training to become certified. As a team, Boss and Trooper Earrey were recertified every year. Boss also performed additional yearly training which included 280 drug hides. Of the 945 drug hides in his training prior to his last recertification in 2007, Boss found all of them. Boss has never been sent to remedial training. In Trooper Earrey's experience, Boss was reliable in the field as well. Based on the testimony and the evidence presented on the issue, the undersigned finds that K-9 Boss was reliable. Probable cause to believe the Vehicle contained contraband was established by K-9 Boss's positive alert signal. See United States v. Watts, 329 F.3d 1282, 1286 (11th Cir. 2003) (citing Banks, 3 F.3d at 402) (stating that the Eleventh Circuit "has recognized that probable cause arises when a drug-trained canine alerts to drugs")). Because the positive alert established probable cause to believe the Vehicle contained contraband, the search of the Vehicle was proper under the automobile exception to the warrant requirement.[16]

---

[16] Defendant is not attacking the sufficiency of the search warrant affidavit for the storage unit, so it is not necessary to determine the reliability of K-9 Goblin. However, the undersigned notes that both Boss and Goblin alerted to the presence of narcotic odor on the storage unit.

## V.  Conclusion

The traffic stop in this matter was permissible because Trooper Earrey had probable cause to believe that a traffic violation was occurring.  Furthermore, the length and scope of the traffic stop were permissible.  Before the traffic stop ended, the troopers had reasonable, articulable suspicion that criminal activity was afoot, which justified the continued detention of Defendant for a short period of time to investigate.  Finally, the search of the Vehicle was supported by probable cause because a reliable drug K-9 alerted to the presence of narcotics in the Vehicle.  Defendant's sole remaining grounds for suppression, that all evidence obtained after the search of the Vehicle is fruit of the poisonous tree, would only be grounds for suppression if the evidence obtained from the search of the Vehicle had been unlawfully obtained.

After due consideration, it is

**RECOMMENDED**:

That Defendant's Motion to Suppress Physical Evidence  (Doc. No. 36) be **DENIED.**

**RESPECTFULLY RECOMMENDED** at Jacksonville, Florida on April 19, 2010.

JAMES R. KLINDT
United States Magistrate Judge

kaw
Copies to:

Honorable Timothy J. Corrigan
United States District Judge

Assistant U. S. Attorney (Baker)
Donald B. Mairs, Esquire